(No. 22680.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. EARL HERBERT, Plaintiff in Error.

*Opinion filed June 18, 1935.*

Orr, J., dissenting.

Louis N. Blumenthal, and Samuel L. Golan, for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and J. J. Neiger, (Edward E. Wilson, and Henry E. Seyfarth, of counsel,) for the People.

Mr. Justice Herrick delivered the opinion of the court:

The plaintiff in error, Earl Herbert, (hereinafter called the defendant,) was convicted at the June term, 1931, of the criminal court of Cook county, of the crime of murder and was sentenced to the penitentiary for the term of his natural life. The cause comes here for review on writ of error sued out of this court by the defendant to review the judgment of conviction.

Numerous errors are assigned, but so far as material here they may be grouped as follows: (1) The trial court erred in admitting immaterial, irrelevant, prejudicial and hearsay evidence on the part of the People; (2) the prosecuting witness was guilty of misconduct in the court room

which prejudiced the defendant's case, and the trial court erred in refusing to withdraw a juror and to continue the cause on the motion of the defendant; and (3) the court erred in giving certain instructions to the jury on behalf of the People and erred in refusing to give instruction 10 on behalf of the defendant.

The facts which we deem material to the consideration of the case and as shown by the record are substantially as follows: Thomas Bonner, in July, 1930, lived on the first floor of an apartment building at 7353 Yale avenue, Chicago. About 12:10 A. M. on July 10, 1930, his door bell rang. He answered the ring. A few minutes later his wife, Mary, heard some loud talking and thereupon came to the hallway of the apartment. She there saw two men with revolvers in their hands facing her husband. She heard her husband say, "You've got me wrong," and after that the man whose back was to the door shot her husband. He died several hours later. The wife testified that everything went black when the shot was fired. The men disappeared immediately after the shooting. Lieutenant Moran, of the Englewood station, arrived at the home of the deceased at about 12:20 or 12:25 A. M. and found Mrs. Bonner in an hysterical condition. After he gave her an opportunity to become calm and to collect herself she gave him the description of the man who fired the shot, which description was as follows: "A man about five feet ten inches tall, weighing about 180 pounds, dark, sallow 'complected' and pointed nose and a brown suit." On July 16, 1930, police officers Joseph Haksa and Ed Tyrrell called at the Bonner apartment, bringing with them a large book containing photographs of various persons. The officers started from the rear of the book, showing Mrs. Bonner the pictures. The second picture from the back was a photograph of three men. The name of each individual was printed under his photograph as it appeared in the group picture. The center one of the three was

the defendant, Earl Herbert. There is some conflict in the evidence as to just what occurred when Mrs. Bonner viewed this picture. There is in evidence testimony to the effect that she became hysterical and that she pointed out the picture of Herbert as the man who had killed her husband. There is other evidence to the effect that she turned to her son, Willie, who was present, and asked him if he knew any of the people in the photograph.

On October 10, 1930, the defendant was arrested at a pool-room and restaurant in Summit, one of the environs of Chicago. The parties arresting the defendant consisted of Seaton, of the Walgreen Company, C. L. Rogers, an investigator for the Walgreen Company, and three highway deputy sheriffs, named Peterson, Jelinek and Flaherty. Peterson and Rogers both testified that the defendant, as he was being driven to the police station after the arrest, attempted to bribe them to release him. There is no evidence that he at the time of his arrest or prior to the alleged conversation with Peterson and Rogers had been advised of the offense with which he was charged.

On the 11th day of October, 1930, Mrs. Bonner, her son and daughter were taken to the detective bureau. A few minutes after the arrival of Mrs. Bonner and her children, the defendant, handcuffed to a police officer, was brought into Chief Rafferty's office, where Mrs. Bonner, her son and daughter were present. He was told to take different positions, which he did. He was then ordered taken out of the room by Chief Norton. Some ten or fifteen minutes later he was again brought into the room where Mrs. Bonner was. She again looked at him for several minutes. He was again asked to, and did, assume different positions. There is a controversy, which will be referred to herein later, as to whether Mrs. Bonner on these occasions made the statement, in substance, in the presence and hearing of the defendant, that she recognized him as the man who killed her husband. Later on this same day,

handcuffed to a police officer, the defendant was placed in a squad car and driven to the home of Mrs. Bonner. At the Bonner home he was placed in the same hallway where the deceased was murdered, was asked to, and did, take different positions, a straw hat was placed on his head, and he was viewed for some minutes by Mrs. Bonner. There is also a conflict as to what was said or done by Mrs. Bonner on this occasion.

On the trial of the case Mrs. Bonner testified she recognized Earl Herbert as the man who killed her husband. She testified that the man who fired the shot wore a gray suit and a milan straw hat turned down, and that he had a very sallow complexion and was very pale. The People introduced the evidence of several police officers who were present at the time of the show-ups of Herbert at the detective bureau and at the Bonner home, all of whom testified that she identified the defendant, although they differ as to what words she said on that subject.

The defendant testified in his own behalf. He denied that he committed the murder. He testified that he did not know, see or even hear of Thomas Bonner in his lifetime; that at the time of the murder, on July 10, 1930, and prior thereto, from the latter part of May until after Labor day of that year, he was continuously residing in, without ever leaving, Cleveland, Ohio, or the adjacent resort of Bay Village, approximately one-half hour's ride from 10226 Madison avenue, where he lived for a time with his cousin, Mrs. May Fortier, until he and the Fortier family left for the summer cottage in Bay Village. He testified that he did not know why he was being shown-up to Mrs. Bonner; that he had never seen nor heard of her before in his lifetime; that she looked at him three different times and each time shook her head in the negative; that nothing was said to him concerning the murder of Bonner, or that he was charged with such murder, at the time of or prior to any of the occasions on which he was produced for the

purpose of having Mrs. Bonner view him, and that it was some time after these different show-ups before he knew he was charged with such murder. He denied making an attempt to bribe Rogers and Peterson. The defense also introduced the testimony of Mrs. May Fortier and her husband, Howard; the defendant's cousin, Mrs. Gladys Reagan; her aunt, Mrs. Mary Niggle, and her husband, Edward, and the defendant's uncle, Charles Herbert, all of whom testified that the defendant was in Cleveland, Ohio, and Bay Village, Ohio, during all the time from the latter part of May until after Labor day of 1930. These witnesses fixed the date of July 10 from the fact that Archibald C. Payton, who was an uncle of Mrs. Reagan, then died in Lorain, a suburb of Cleveland. The testimony of some of the alibi witnesses definitely and completely covered all the time of the commission of the murder, and was to the effect that the defendant was in Cleveland and Bay Village the night of the ninth and all of the morning of July 10.

We will first take up the rulings of the trial court on the admission of evidence against which complaint is lodged by the defendant.

On re-direct examination Mrs. Bonner made the statement, in an answer propounded to her by the assistant State's attorney, that she had had police officers detailed at her home for some time just prior to the trial. Objection was made to this statement and the objection was overruled. The detailing of a police guard at the home of Mrs. Bonner was an act over which the defendant had no control. It was a fact unconnected with the crime charged against the defendant and was in nowise relevant to the issues on trial. It had no legitimate place in the case, and, whatever might have been its purpose, it tended to create in the minds of the jury the impression, if not the belief, that the prosecuting witness was in danger of her life or person or of being intimidated by threats of violence by

reason of her activity in prosecuting the defendant. It was prejudicial error to permit this statement to go to the jury. *People* v. *Fiorita,* 339 Ill. 78; *People* v. *Johnson,* 314 id. 486; *People* v. *Decker,* 310 id. 234.

On his cross-examination the defendant was asked when was the first time he went to Cleveland. Objection interposed by the defendant was overruled, and he answered that the first time he recollected he went to Cleveland was about twenty-one years ago. He was then asked if he had gone a number of times since then, to which he answered he had. He was then asked, "Did you always go to Cleveland voluntarily?" Objection was made and overruled and the witness answered that he had. Later he was asked if he went to Cleveland in August, 1920. Objection was interposed and overruled. The witness said he did not remember. He was asked if he then went with anyone to Cleveland. Objection was made and overruled and he was required to answer, to which he replied, "Not to my knowledge." This line of examination was obviously intended to convey to the jury the impression that the defendant had been arrested for some criminal offense and taken by some officer of the law to Cleveland. It is elementary that mere proof that a party has been arrested cannot be used against him in the trial of a criminal case. The rule is, of course, different where he has been convicted of a felony. The cross-examination was improper and the court improperly required the witness to answer the questions.

It is further urged that the court erred in excluding from the evidence two photographs of the defendant, identified as defendant's exhibits 2 and 3, taken while he was at the lake at Bay Village. The time is definitely fixed that exhibit 3 was taken on July 4, 1930, and exhibit 2 on an early day in July. There was oral evidence tending to show that during this period defendant was sunburned and tanned. These photographs were offered for the purpose

of showing that he was neither pale nor white in July, 1930, as testified by Mrs. Bonner, but rather that he was tanned. Mrs. Reagan testified that she was present when each picture was taken and that the pictures were true representations of the objects they purported to represent. On cross-examination she stated she saw the person who snapped the camera but did not remember just which one of the party actually did take the picture, and that she did not develop the film but knew who did. The trial court first ruled that the photographs be admitted in evidence, but later changed his ruling and refused to permit the exhibits to go in evidence. In this ruling the trial court was in error. A photograph shown to be a correct representation of a person during a period of time under investigation is competent where the accuracy of the photograph is proved by the testimony of a person acquainted with the appearance of the individual at the time the photograph was taken. It is not necessary that the correctness of the photograph be proved by the testimony of either an expert witness or by the person who took the picture and developed the film. (*Brownlie* v. *Brownlie*, 357 Ill. 117; 2 Wigmore on Evidence, sec. 790.) The weight of the evidence was entirely for the jury.

During the direct examination of the defendant he was asked by his counsel, "Did you kill Thomas Bonner?" His answer was, "No; how could I kill him? I never heard of him." At this juncture Mrs. Bonner arose in the rear of the court room and shouted, "You dirty, lying thing, you! How dare you sit there and say that! You dirty liar!" The court immediately said, "Let her go outside." Upon the happening of this unforeseen and untoward outbreak the defendant's attorneys moved the court to withdraw a juror and to continue the cause and asked to be heard on the motion outside the presence of the jury. The court refused to hear any argument and denied the motion. The court did not denounce Mrs. Bonner's conduct

to the jury nor in anywise instruct the jury to disregard her action. While the People were in nowise to blame nor is the trial judge to be in the leastwise criticised for this regrettable conduct on the part of Mrs. Bonner, yet the defendant's right to a fair trial, conducted in an orderly manner, should have been preserved. The episode was of a highly inflammatory character and was well calculated to arouse the passion and prejudice of the jury against the defendant. It was a dramatic incident introduced into the procedure in a court of justice by the prosecuting witness which might well have deprived the defendant of a fair, calm and dispassionate consideration of his case at the hands of the jury. While the control of the conduct of the trial must generally be left to the discretion of the presiding judge, yet it is his duty to see that the proceeding is conducted in an orderly manner and that the rights of neither party are unduly prejudiced by some injurious incident happening in the course of the trial in the presence of the jury. (*People* v. *Munday,* 280 Ill. 32.) While in the instant case we are not prepared to say that the incident was sufficient to require the court to have withdrawn a juror and declared a mis-trial, yet the trial court should have admonished the jury to disregard the occurrence.

The court properly refused to give instruction 10 requested by the defendant. The substance of that instruction is covered by instruction 14 given for the defendant.

It is urged by the defendant that the court erred in giving for the People their instructions 10, 11 and 14. The 14th instruction is an instruction relating to circumstantial evidence and is in the form generally requested by the People in the trial of criminal cases where the record warrants the giving of such instruction. We have grave doubts as to whether the instruction should have been given in this particular case. However, we are not disposed to hold that the giving of such instruction constituted reversible error.

Instruction 10 given for the People pertains to the alleged flight of a defendant, and told the jury that if they believed, beyond a reasonable doubt, that a crime was committed, and "if you also believe, beyond all reasonable doubt, that the defendant, immediately after the commission of the crime with which he stands charged, fled and remained away until taken into custody, such flight is a proper circumstance to be considered in determining the guilt or innocence of the defendant." The circumstance of flight, where proved, raises no legal presumption that the accused is guilty of the offense charged against him. The fact of flight is a circumstance which may be considered by the jury as tending to prove guilt, but it must be considered in connection with all the other evidence in the case. (*Fox* v. *People*, 95 Ill. 71.) If there is any evidence that the defendant fled immediately after the commission of the crime it must be gleaned from the testimony of Mrs. Bonner and chief of detectives John W. Norton. Mrs. Bonner's testimony is to the effect that she identified the defendant as the man who shot her husband. The only evidence of Norton that could be said to relate to the alleged flight of the defendant is Norton's statement that he was looking for the defendant after July 16. There was no evidence that the defendant attempted to keep out of sight of police officers, that he was ever disguised or that he assumed a name different from his own. The officer in nowise explained or attempted to explain what steps he took in looking for the defendant—whether he inquired at his former home in Chicago, asked concerning him among those who knew him, or visited his accustomed places of resort. Flight, in criminal law, is defined as "the evading of the course of justice by voluntarily withdrawing oneself in order to avoid arrest or detention, or the institution or continuance of criminal proceedings. The term signifies, in legal parlance, not merely a leaving, but

a leaving or concealment under a consciousness of guilt and for the purpose of evading arrest. Such consciousness and purpose is that which gives to the act of leaving its real incriminating character." (16 Corpus Juris, sec. 1063, p. 552; *People* v. *Vidal,* 121 Cal. 221, 53 Pac. 558.) The People have cited no authority warranting the giving of this instruction. The evidence in the record did not justify the giving of it, and to give it constituted reversible error.

Instruction 11 given for the People is as follows:

"The court instructs the jury, as a matter of law, that before a defendant can avail himself of the defense of an alibi, the proof must cover the whole of the time of the commission of the crime and be supported by such facts and circumstances in evidence as are sufficient (when considered in connection with all the other evidence in the case) to create in the minds of the jury a reasonable doubt of the truth of the charge against the defendant."

The defendant calls attention to the fact that the evidence of the alibi completely covered not only the day and hour of the commission of the crime but a period of several weeks immediately succeeding the time of the killing and tended to prove that the defendant was in another State on the day and hour of the murder. In support of his claim that in that condition of the record the giving of such instruction is held to constitute reversible error, the defendant directs our attention to *People* v. *Braidman,* 323 Ill. 37, *People* v. *Reno,* 324 id. 484, *People* v. *Frugoli,* 334 id. 324, and *People* v. *Lacey,* 339 id. 480. Such cases do hold as contended by the defendant, but in *People* v. *Gasior,* 359 Ill. 517, the cases cited by the defendant were severally reviewed, and it there was decided that so far as those cases held that the giving of such instruction constituted prejudicial error such holding was not adhered to. Upon the authority of *People* v. *Gasior, supra,* we hold prejudicial error was not committed in the giving of such instruction.

Other errors are assigned and argued, but in view of what we have said we do not deem it necessary to pass on them.

For the errors indicated, the judgment of the criminal court is reversed and the cause is remanded.

*Reversed and remanded.*

Mr. JUSTICE ORR, dissenting.