THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHESTER HOLMES, JR., Defendant-Appellant.

(No. 58468;

First District (4th Division)—May 22, 1974.

JOHNSON, J., specially concurring.

Paul Bradley and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Jerald A. Kessler, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, Chester Holmes, Jr., was indicted on October 29, 1971, for the murder of Wash Harris. After a trial by jury a verdict was entered on May 19, 1972, finding him guilty as charged. The court sentenced him to a term of 17 to 25 years in the Illinois State Penitentiary. He now appeals his conviction to this court.

The record discloses that the deceased, Wash Harris, and his wife, Muriel, owned a two-flat building at 7236 South Euclid Avenue in Chicago. He and his family occupied the first floor apartment therein. The defendant, Chester Holmes, Jr., along with his family, occupied the second floor apartment as tenants. On August 15, 1971, according to the testimony of Muriel Harris, wife of the deceased, she, her husband, and two of their children returned home from evening church services at 10 P.M. While she and the children entered their first floor apartment, her husband went upstairs apparently to collect the month's rent. From her first-floor bedroom, Mrs. Harris could hear a conversation between her husband and the defendant coming from the upstairs corridor, although she could not hear what was being said. After about 5 or 10 minutes she heard someone's footsteps go from the hallway to the bedroom and back again. Mrs. Harris then testified that she heard four or five gunshots. She ran out into the hallway and saw her husband staggering down the stairs. He exclaimed: "Honey, Mr. Holmes shot me," and repeated it. She helped him into the living room of their apartment, where he collapsed.

Larry Cosey, a 16-year-old stepson of the deceased, testified that he witnessed the defendant shoot his father through a second-floor window while sitting on a next door neighbor's front porch. He said he immediately ran to the rear of the apartment building and entered the family's apartment through the back door. He ran through the house and encountered his mother and father in the front area of the apartment. He heard his father tell his mother, "Honey, Mr. Holmes shot me."

The police arrived in 2 or 3 minutes. After attending to the deceased, they went upstairs, questioned and arrested the defendant. A revolver with five spent cartridges was recovered from under a bed mattress in defendant's apartment. In the opinion of a ballistics expert, whose findings were stipulated to at trial, a bullet recovered from the body of the deceased was fired from the weapon.

A number of witnesses testified on behalf of the defendant as to his good character and reputation. The defendant took the stand and denied that he shot Wash Harris and denied that he had the gun in his possession on the night of the incident.

Five grounds for reversal of defendant's conviction are asserted. It is contended that (1) the court erred in granting defendant only 10 peremptory challenges during the voir dire, since 20 are required by statute in a "capital case"; (2) in refusing to hear defendant's motion to dismiss the indictment and quash the venire prior to trial; (3) in denying defendant's motion to suppress as evidence the gun seized in a search of defendant's apartment incident to arrest; (4) in refusing to declare a mistrial and in not effectively admonishing the jury after the wife of the deceased cried audibly in the courtroom; and (5) the defendant was not found guilty beyond a reasonable doubt because of the lack of credibility of the eyewitness testimony.

We first address ourselves to the contention that the defendant did not receive the number of peremptory challenges to which he was entitled. Section 115—4(e) of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 115—4(e)) provides in pertinent part:

"A defendant tried alone shall be allowed 20 peremptory challenges in a capital case, 10 in a case in which the punishment may be imprisonment in the penitentiary, and 5 in all other cases * * *."

The Illinois murder statute at the time provided: "A person convicted of murder shall be punished by death or imprisonment in the penitentiary * * *." (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(b).) Had the defendant here been subjected to the possibility of receiving the death penalty for the murder conviction, there is no doubt he would have been entitled to 20 peremptory challenges. The State indicated at the outset, however, that it was not seeking the death penalty upon conviction. The question then is whether the fact that the State declares its intention not to seek the death penalty renders the proceeding no longer a "capital case" under the terms of the Illinois statute involved.

■■ Defendant claims that the classification of an offense for purposes of determining the proper number of peremptory challenges cannot be changed by any declaration that the prosecuting attorney may make, and cites *Kerley v. State*, 89 Tex. Crim. 199, 230 S.W. 163. We find the Texas court's construction of the statute involved in *Kerley* unnecessarily rigorous and inapplicable here. In the instant case the jury had no control over sentencing, was not instructed regarding the penalty to be imposed, and could not have returned a verdict prescribing the death penalty at its discretion. (Compare *Kerley v. State;* also compare *Lee v. State*, 31 Ala. App. 91, 13 So.2d 583; *Caesar v. State*, 127 Ga. 710, 57 S.E. 66.) We feel

that since the State declared its intention not to seek capital punishment, and capital punishment was in fact not threatened upon conviction, the case was no longer "capital" under a sensible construction of the term as used in section 115—4(e) of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 115—4(e)). (*Cf. State v. Montgomery,* 363 Mo. 459, 251 S.W.2d 654.) There was thus no error in limiting defendants peremptory challenges to 10.

It is next claimed that the court erred in not entertaining the defense's pre-trial motion to dismiss the indictment and quash the venire prior to trial. The motion alleged that the defendant was a black citizen and that the Grand Jury voting the indictment and the venire which was available to be called was selected contrary to statute in such a manner that it failed the statutory objective of achieving a cross section of the community. The record shows that the motion was filed on May 10, 1972, the day before a jury was selected, pursuant to sections 114—1(a)(4), 114—1(b), and 114—3 of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 114—1(a)(4), 114—1(b), and 114—3). These provisions read in relevant part:

"§ 114—1   Motion to Dismiss Charge.

(a) Upon the written motion of the defendant made prior to trial before or after a plea has been entered the court may dismiss the indictment, information or complaint upon any of the following grounds:

\* \* \*

(4) The indictment was returned by a Grand Jury which was improperly selected and which results in substantial injustice to the defendant;

\* \* \*

(b) The court shall require any motion to dismiss to be filed within a reasonable time after the defendant has been arraigned. \* \* \*"

\* \* \*

§.114—3   Motion to Discharge Jury Panel.

(a) Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel prior to the voir dire examination. For good cause shown the court may entertain the motion after the voir dire has begun but such motion shall not be heard after a jury has been sworn to hear the cause.

\* \* \*

(c) If the motion states facts which show that the jury panel has been improperly selected or drawn it shall be the duty of the court to conduct a hearing. \* \* \*"

These provisions, although designating the proper time for the motions to be filed, do not specify the proper time for the hearing to be held. The court stated that it would hold a hearing on the combined motion at the conclusion of the case if necessary—that is, if there was a conviction. Defense counsel expressed his objection to that procedure. A jury was impaneled, the case went to trial, and a finding of guilty was returned on May 19, 1972. The court then offered defendant a hearing on the motion as part of the post-trial motions. Defense counsel replied that he did not wish a hearing at that time, and that he chose to assert error in the failure of the court to hear the motion before trial.

The defendant claims prejudicial error because of the court's procedure first because it put the court in the position of attempting to hear the motion on the merits while having just presided over a trial in which the defendant had been found guilty. He submits that the trial court cannot be expected to disregard the evidence it has heard relative to guilt or innocence and take an open-minded view of the motion. We find such a claim without merit. As the State points out, such an argument contravenes the basic assumption that a judge will not allow prior proceedings to influence his judgment on the merits of a later hearing. If this were not so, every post-trial motion would require disposition by a judge other than the one who presided over the trial. The motion filed in the instant case was concerned with questions of law and we must assume that the trial court would impartially resolve them without improper influence.

Defendant points out that if the pre-trial motion was found to have merit only after trial, a wasteful re-trial would be necessary. Thus litigation would be expedited by requiring a hearing before trial and the defendant would not be subjected to the possibility of being inconvenienced by a second lengthy trial. The judge here, however, was prompted to postpone the hearing so that he could expedite the trial, which had been on call for 6 months, and perhaps obviate the need for any hearing on the motion at all if the jury found the defendant not guilty. We find no error in the judge's choice of procedure under these circumstances. The record shows that the case was first assigned to Judge Aspen on November 15, 1971. On that date counsel for the defendant requested a continuance, and the case was continued with subpoenas until December 13, 1971. The case was then continued with subpoenas to February 7, 1972, then to April 3, 1972, then to May 8, all on motions of defense counsel. The State's witnesses were ready to proceed. On May 8, at his request again, the court ordered the case held on call to May 9, and then again to May 10. It was on this date that the present motion was first submitted. The unavailability of a defense witness to appear at the hearing on the motion

would have unnecessarily caused further delay. It was in this context that the judge was prompted to delay the hearing on the motion.

Defendant also claims that postponing the hearing affected his trial strategy, and that he was forced to choose between proceeding with a jury which he believed to be improperly composed or relinquishing his right to a jury trial entirely. We find no merit to this contention. This "dilemma" was not created nor exacerbated by the court's decision to decide the motion after trial. Had the judge held the hearing prior to trial and ruled for the defendant, the result would be no different than if the motion were granted after trial—a new jury would be required. If a pre-trial hearing on defendant's motion were held and the motion was denied, the defendant would be faced with the same dilemma he postulates was caused by postponing the hearing—proceeding with a jury which he still believed to be improperly composed or relinquishing his right to a jury trial. Although he might have had some consolation in knowing that the motion was denied before making a choice, the difference is not sufficient to warrant labeling it prejudicial error.

■■ We must stress, however, that in finding that the judge did not commit prejudicial error in postponing the hearing here, we have considered the facts peculiar to this case—including the nature of the motion and the fact that the trial had already been unduly delayed by defendant. We feel confident that our decision will not allow a trial court in all circumstances to postpone hearings on pre-trial motions to quash an indictment or dismiss a jury panel. We do not feel that the court here abused its discretion in determining that the ends of justice would best be served by holding the hearing after trial, if it was still necessary at that time.

The next contention in this appeal is that the court erred in denying defendant's motion to suppress as evidence a gun seized by the police from defendant's apartment. The evidence shows that shortly after the shooting had occurred the police went to the second-floor apartment of the defendant and his family looking for the defendant. Officer Dwyer testified that he entered through the first floor of the building where the deceased resided, and went up the inside stairway to the second floor. Upon gaining entry through the front door, he found several police officers already in the apartment with the defendant and his wife. The defendant was standing in the doorway of a bedroom, "halfway in and halfway out," engaged in conversation with a Sergeant Manning. There were no police officers standing behind the defendant. Officer Dwyer said that he knew at that time that the name of the person in the doorway was Chester Holmes, Jr., and that the name of the suspect they were look-

ing for was Chester Holmes. He then stepped behind the defendant into the bedroom and noticed that the bed was made, but that "one corner of the spread was pulled up." He then lifted up the mattress and found a Colt, six-shot, snub nose revolver. The bed was four and one-half to five feet from where the defendant was standing. Expert testimony indicated that the gun fired the bullet recovered from the body of the deceased.

■■ Defendant contends that the police transcended the constitutional limitations in regard to the permissible scope of a search incident to arrest as delineated in *Chimel v. California*, 395 U.S. 752. He thus presents no claim that he was not under arrest at the time of the search. In *Chimel*, a majority of the United States Supreme Court recognized that, once an arrest is made:

> "There is ample justification * * * for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
>
> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself." (395 U.S. at 763.)

We feel that the area where the gun was found here was "within [the defendant's] immediate control." He was only 5 feet from the bed. No one was between him and the bed. He was in the doorway of the room in which the bed was located. It appears from the evidence that there was more than a mere academic possibility of him gaining access to whatever might have been concealed under the mattress. We find the seizure consistent with the contours of reasonableness contemplated by *Chimel*. (*Cf. People v. Perry*, 47 Ill.2d 402, 266 N.E.2d 330.

It is next proposed that there is reasonable doubt of defendant's guilt because the testimony of the only eyewitness to the murder was so unsatisfactory and improbable that it must be disregarded. Larry Cosey, the 16-year-old stepson of the deceased, testified that he was sitting outside on the front porch of his next door neighbor's house. He observed his father and the defendant, who were visible through a second-floor window. The defendant had a gun. He said he saw the defendant shoot his father. After the first shot, the youth jumped down from the porch and ran to the back door of his building. He went up a flight of stairs, entered his family's apartment, ran through it, and found his mother and father in the front hallway. He said he heard his father say to his mother: "Honey, Mr. Holmes shot me." The witness further stated that he never testified to these facts at the preliminary hearing and did not tell anyone

except his mother that he observed the shooting until 2 months after it had occurred, at which time he told an Officer Sicula.

Defendant urges that both the boy's and his mother's long delay in informing the authorities that he was an eyewitness makes his testimony "less than credible." He notes the boy had ample opportunity to tell the authorities on the night of the shooting, when 10 or 12 policemen were at his home, and at the preliminary hearing, where he was present but did not testify. It is further intimated that the participation by an attorney hired privately by the deceased's family somehow makes the testimony more suspicious. Defendant also questions the inherent credibility of the boy's story about running to the rear of the house after witnessing a shooting in the front, characterizing it as a "strange reaction."

We are not persuaded that Larry Cosey's testimony was too suspect to allow the jury to weigh it for themselves. The 2-month delay in notifying the police that he witnessed the shooting is not fatal to his story. He was 15 years old at the time and we can assume unsophisticated in the rigors of criminal proof. On the night of the shooting, after witnessing the arrest of the defendant, he may well have been convinced that the police had their man and that there was little need to reiterate what he felt the police knew. In fact, he testified that from the date of the occurrence until the date he divulged his story no one came to his house to take any statements. He also testified that no one interviewed him at the preliminary hearing. We finally fail to see anything "strange" about a 15-year-old boy running to the rear of his house after witnessing gunfire in the front.

Furthermore, even without the eyewitness testimony, there was more than sufficient evidence for the jury to return a guilty verdict. The deceased's wife testified that immediately after hearing gunshots she went into the hallway. She saw her husband coming from the second floor, staggering. He said to her "Honey, Mr. Holmes shot me," and repeated it. She helped him into their living room and he collapsed on the floor. Minutes later the police arrived, and after speaking with Mrs. Harris, went directly upstairs to the defendant's apartment. There while questioning the defendant they found a revolver under a bed mattress with five spent cartridges. A ballistics expert linked the weapon to the shooting. We find no basis for the assertion that the evidence was insufficient to sustain a finding of guilty.

We finally consider defendant's contention that the trial judge erred in not declaring a mistrial and in not effectively admonishing the jury after the wife of the deceased began audibly crying in the courtroom. The crying apparently came as a reaction to the testimony of the expert witness, Dr. Shalgos, as to the cause of death. Defense counsel requested

the court to declare a mistrial, or, alternatively to ask Mrs. Harris to remain outside the courtroom during the expert testimony and to admonish the jury not to be influenced by the display of emotion. The court granted the second request, excluding Mrs. Harris and cautioning the jury "to disregard the incidents that you heard in this courtroom."

■■ The law is established that a trial judge has broad discretion in determining whether a mistrial will be declared. (*People v. D'Argento*, 106 Ill.App.2d 36, 245 N.E.2d 501.) We perceive no abuse of that discretion here. The trial judge's immediate and affirmative action in excluding the wife and instructing the jury to disregard the incident provided ample protection from prejudice to the defendant, and we do not feel a poll of the jurors as to the possible effect the incident had on them was necessarily warranted under these circumstances. See *People v. Spagnola*, 123 Ill.App.2d 171, 260 N.E.2d 20; *cf. People v. Herbert*, 361 Ill. 64, 196 N.E. 821; see also Annot., 46 A.L.R.2d 949, and cases collected therein.

In view of all the foregoing, we are compelled to affirm the defendant's murder conviction.

Affirmed.

ADESKO, P. J., and JOHNSON, J., concur.

Mr. JUSTICE JOHNSON specially concurring:

I approve of the results reached and of the reasons stated in the above opinion, except one. I concur in the opinion's holding that the trial court did not commit reversible error in failing to hear defendant's motion to dismiss the indictment and quash the venire for the reason that same were not timely filed.

This case was assigned to the trial judge on November 15, 1971. After several continuances, the case was set for trial on May 10, 1972. On the latter date, defendant filed the above mentioned motions and asked for a hearing. The court denied the hearing and proceeded to trial indicating that a hearing would be conducted after trial.

The motions to dismiss the indictment and quash the venire were made pursuant to section 114—1(a)(4) of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, §§ 114—1(a)(4) and 114—3). These statutes in relevant part read as follows:

"§ 114—1 Motion to Dismiss Charge.

(a) Upon the written motion of the defendant made *prior to trial* before or after a plea has been entered the court may dismiss the indictment, information or complaint upon any of the following grounds:

* * *

(4) The indictment was returned by a Grand Jury which was

improperly selected and which results in substantial injustice to the defendant;

\* \* \*

(b) The court shall require any motion to dismiss to be filed within a reasonable time after the defendant has been arraigned. Any motion not filed within such time or an extension thereof shall not be considered by the court and the grounds therefor, except as to subsections (a)(6) and (a)(8) of this section, are waived.

\* \* \*

§ 114—3 Motion to Discharge Jury Panel.

(a) Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel *prior to the voir dire examination.* For good cause shown the court may entertain the motion after the voir dire has begun but such motion shall *not be heard after* a jury has been sworn to hear the cause.

(b) The motion shall be in writing supported by affidavit and shall state facts which show that the jury panel was improperly selected or drawn.

(c) If the motion states facts which show that the jury panel has been improperly selected or drawn it shall be *the duty of the court to conduct a hearing.* The burden of proving that the jury panel was improperly selected or drawn shall be upon the movant." (Emphasis added.)

The statute clearly states that upon written motion made prior to trial the court may dismiss an indictment. It further states that any objection to the manner in which a jury panel has been selected or drawn shall be raised by motion to discharge the jury panel prior to the voir dire examination, and if the motion states facts which show that the jury panel has been improperly selected or drawn, it shall be the *duty* of the court to conduct a hearing. The court shall require any motion to dismiss to be filed within a reasonable time after defendant has been arraigned. Any motion not filed within such time or an extension thereof shall not be considered by the court.

The State's brief notes that motions "similar" to the defendant's in the present case were rejected in *People v. Connolly* (1973), 55 Ill.2d 421, 303 N.E.2d 409, and also cites *Swain v. Alabama* (1965), 380 U.S. 202; *People v. Powell* (1973), 53 Ill.2d 465, 292 N.E.2d 409. In all of the cases cited by the parties these motions were heard as pre-trial motions before trial on the merits. There were no cases cited by the parties and our research has revealed none where such motions were held over and

heard after trial on the merits. I would hold that to permit such a procedure would constitute reversible error. I hope that by this opinion, we are not saying that a trial judge may in his descretion postpone the hearing of a pre-trial motion until after a jury verdict.