THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CATHY NATHANIEL, Defendant-Appellant.

First District (1st Division)    No. 79-2490

Opinion filed December 28, 1981.

Sam Adam, of Chicago (Ira A. Moltz, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Dean C. Morask, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, defendant Cathy Nathaniel was found guilty of murder and burglary. She was sentenced to a term of 35 years for the murder conviction and a concurrent term of 7 years for the burglary conviction.

On appeal, defendant presents three issues: (1) she was not proven guilty of murder beyond a reasonable doubt; (2) reversible error was committed by the trial court when defendant was permitted only 12 peremptory challenges; and (3) the trial court abused its discretion when a 9-year-old misdemeanor conviction for deceptive practices was allowed for impeachment purposes and when a police photograph was submitted to the jury.

The charges against defendant arose out of the shooting death of Steven Ticho in the early hours of May 4, 1978. At trial, there were many witnesses for the State. However, the key State witness was Bernice Albright, defendant's companion on the night Ticho was killed. Her

testimony at trial was as follows: During the evening hours of May 3, 1978, Ms. Albright accompanied defendant to a lounge on the near north side of Chicago. There, the women met two men, the victim and his friend, Klaus Krutzikowski. When the bar was closing, these four people left together and went to the victim's apartment in Krutzikowski's van.

Upon arriving at the apartment, the victim toured his three companions through the apartment. Albright and Krutzikowski then sat on the couch in the living room. Defendant was with the victim in the bedroom. After approximately half an hour, Albright requested to leave. After checking with defendant if it was all right to leave, Albright left with Krutzikowski, who was to take her home. Upon Krutzikowski's inquiring about breakfast, Albright suggested a restaurant called the Hasty Tasty. After going there, she was driven to her apartment building by Krutzikowski.

Sometime later defendant appeared at the apartment she shared with Albright and several other people. Defendant had two shopping bags with her and requested to speak with Albright in the bathroom. Defendant then told Albright that she shot the victim. Defendant also showed Albright the keys to the apartment and made her smell the fired gun.

At defendant's urging, the two women went back to the victim's apartment, where they were let into the lobby by the doorman. Defendant showed Albright how she shot the victim in the head. They then proceeded to pack several shopping bags with the victim's personal items of value.

At one of the elevator stops, the women met a maintenance man who helped them with a torn bag. Upon exiting the lobby, the women returned to their own apartment in defendant's car.

The following day Albright accompanied defendant on a shopping trip. Defendant first purchased several items of clothing without Albright's presence in the store. At a jewelry store, defendant purchased a gold watch with the victim's credit card. Defendant next unsuccessfully attempted to purchase several pairs of shoes. Albright did not go into this store with defendant.

Albright moved to a new address with her boyfriend to avoid being associated with defendant. However, on May 6, 1978, she was arrested and taken to the police station. At that time she learned defendant was also in police custody and had implicated her in the victim's death. Albright was questioned first by several police officers. She then related her account of the events on May 3 and 4 to an assistant State's Attorney. After this, she was told she would not be prosecuted for anything related to these events.

Defendant testified in her own defense. Her testimony conflicted sharply with that of her companion. She denied shooting the victim, and

implicated Albright as the one who did the shooting. Defendant testified that she had engaged in prostitution for 10 years and that she and Albright, on the evening of May 3, 1978, went to a lounge to "hustle." After meeting the victim and Krutzikowski, they went to the victim's apartment. She admitted going to the bedroom alone with the victim, while Albright and Krutzikowski remained in the living room.

Defendant testified that Albright was going to try to "turn a trick" with Krutzikowski when they left the apartment. She then received a phone call from Albright, who was at a restaurant, that she was going home. After this call, defendant testified, the victim suggested that they could have an "orgy" if defendant got Albright to return.

Defendant said she then took a cab to her apartment in order to persuade Albright to come back with her. Upon their return, she said, Albright's boyfriend Curtis Spearman was with them. She and Albright went up to the victim's apartment, leaving Spearman on the street.

Later, defendant testified, she was in the bathroom when she saw Albright and Spearman walk by towards the victim's bedroom. She then heard a shot, following which she observed Albright leaving the bedroom with a gun. She then ransacked the apartment with Albright and Spearman. Defendant said she left with Albright, leaving shopping bags full of the victim's items on the 44th floor of the apartment building. They then took a cab back to the lounge and picked up her car, which they drove back to the victim's building. They retrieved the shopping bags, met Spearman and returned to their own apartment.

Defendant admitted going on a shopping spree the following day. She used the victim's credit cards. She purchased clothes and a watch and was unsuccessful in purchasing some shoes. She said Albright was with her at all times.

Several days after the incident, defendant turned herself over to a friend who was a police officer. She was taken to the station, where she was questioned and charged with murder relating to this incident.

On cross-examination, the defendant admitted she used many aliases, including Catherine Soriano. She was also presented with some prior statements she made while at the police station. She did not remember telling a police investigator that Krutzikowski left alone and that she and Albright left once with the apartment keys to get some food. She admitted telling an assistant State's Attorney that both Krutzikowski and Albright left together, but that Albright returned 10 minutes later.

The doorman at the victim's apartment building testified at the trial. He saw the victim enter the building with his three companions at approximately 12:30 a.m. An hour and a half later he saw the white man and one of the black women leave. Later the other black woman left, asking for a cab. She returned with the first woman. They let themselves in with

keys to a security door. About one hour after they returned, the two women left together, carrying two shopping bags each. They went to a car parked across the street.

A night supervisor and maintenance man at the apartment building testified he saw a white man and a black woman leaving the 44th floor at about 1:30 a.m. on May 4, 1978. A few hours later, he saw two black women leaving the 44th floor with two shopping bags each.

Klaus Krutzikowski testified he met the victim, a friend of his, at a lounge on May 3, 1978. They met two black women. He identified defendant as one of the women and stated that Bernice Albright, introduced initially as Dee Dee, was the second woman. The four of them left the lounge around midnight and drove to the victim's apartment in Krutzikowski's van. He stated the victim and defendant went into the bedroom, while he remained in the living room with Albright. After making some drinks, he left with Albright. He testified that Albright requested that they stop for breakfast. Upon leaving the restaurant, he took Albright to her apartment building at around 3 a.m. Upon cross-examination, he stated that Albright made several phone calls.

Defendant claims she was not proven guilty beyond a reasonable doubt because her conviction rests solely upon the testimony of Bernice Albright, an accomplice witness. (See *People v. Kiel* (1979), 75 Ill. App. 3d 1030, 394 N.E.2d 883; *People v. Savory* (1978), 62 Ill. App. 3d 750, 379 N.E.2d 372.) She argues that Albright's testimony is totally unbelievable and was motivated by defendant's own accusations that Albright was the perpetrator of the crime.

While it is true, as defendant points out, that the issue here is the credibility of her testimony against that of the State's witness Albright (*People v. Hansen* (1963), 28 Ill. 2d 322, 192 N.E.2d 359), the rule in Illinois is that testimony of an accomplice, even uncorroborated, is sufficient to sustain a conviction if it satisfies the trier of fact beyond a reasonable doubt. (*People v. Hansen; People v. Thomas* (1979), 72 Ill. App. 3d 28, 389 N.E.2d 1316.) Such is the quantum of proof even in situations where the testimony is attended with such possible infirmities as malice toward the accused, promises or hopes of leniency or the hope of benefits from the prosecution. *People v. Farnsley* (1973), 53 Ill. 2d 537, 293 N.E.2d 600; *People v. Hansen.*

■■ It is upon such infirmities and shortcomings that defendant urges us to rule that the evidence was not sufficient to find her guilty beyond a reasonable doubt. Such infirmities, however, go to the questions of the weight of the evidence and the credibility of the witnesses, matters which are within the province of the trier of fact. (*People v. Hansen.*) We find that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of murder and burglary.

Defendant also argues reversible error in that she was prevented from exercising all 20 of her peremptory challenges during the *voir dire* examination of the jury. (Ill. Rev. Stat. 1979, ch. 38, par. 115—4(e).) She was allowed 12 challenges by the trial court. Before this examination began, the State was uncertain whether the facts of the case qualified it for a sentence of death, and if it did, whether this penalty would be sought. Consequently, the State requested that the *voir dire* of the jury be conducted under the guidelines of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The trial court refused to do so.

Generally, where a party has been deprived of the right to exercise all of the entitled peremptory challenges when impaneling a jury (Ill. Rev. Stat. 1979, ch. 38, par. 115—4(e)) reversible error has been committed. (*Gulf, Colorado & Santa Fe Ry. Co. v. Shane* (1895), 157 U.S. 348, 39 L. Ed. 727, 15 S. Ct. 641; *People v. Webster* (1935), 362 Ill. 226, 198 N.E. 322.) However, when the State has announced its intention not to seek the death penalty the defendant's statutory right to 20 peremptory challenges is not infringed because the case is, effectively, "no longer 'capital' under a sensible construction of the term as used in section 115—4(e) * * *." *People v. Holmes* (1974), 19 Ill. App. 3d 814, 817, 313 N.E.2d 297, *appeal denied* (1974), 56 Ill. 2d 589.

▪■■ In this case the State did not pursue the issue of the death penalty punishment after the trial court's decision during *voir dire* not to "Witherspoon" the jury. The State argues on appeal that this decision effectively prevented it from seeking the death penalty upon a finding of guilt. Although we do not wholly approve of this procedure, we agree that the trial court's decision eliminated the possibility that defendant could receive the death penalty. This situation then is similar to that in *People v. Holmes*. The defendant's right to 20 peremptory challenges was not prejudiced here as the case was effectively no longer a "capital" case within the meaning of the statute. 19 Ill. App. 3d 814, 817.

Lastly, defendant argues that the trial court abused its discretion by allowing the State to impeach her with a 9-year-old misdemeanor conviction for deceptive practices and also in allowing police photographs to be submitted to the jury.

In *People v. Montgomery* (1971), 47 Ill. 2d 510, 516, 268 N.E.2d 695, the Illinois Supreme Court stated the standard by which the credibility of a witness may be impeached by the use of prior convictions. Prior convictions may be used for impeachment purposes if the crime (1) was punishable by death or imprisonment in excess of one year, or (2) involved a dishonest or a false statement regardless of the punishment, unless (3) in either case the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice. In weighing the probative value of the defendant's

testimony against the risk of unfair prejudice, the trial court must consider such factors as the nature of the crime, the nearness or remoteness in time of the conviction to the trial, the subsequent career of defendant and the similarities of the crime. *People v. Spates* (1979), 77 Ill. 2d 193, 395 N.E.2d 563; *People v. Montgomery*.

■■ In this case, the prior conviction for deceptive practices was for a crime that inherently involves dishonesty or false statements. Since the time of that conviction, defendant admits to engaging in prostitution as a way of life. The 9-year-old conviction also is within the 10-year-limit prescribed in Rule 609 of the proposed Federal Rules of Evidence adopted in *People v. Montgomery* (1971), 47 Ill. 2d 510, 516. The trial court did not abuse its discretion in this regard.

■■ We find that admission of the photographs did not deprive defendant of a fair and impartial trial and did not constitute reversible error. (*People v. Aponte* (1977), 45 Ill. App. 3d 1030, 360 N.E.2d 424.) Defendant was identified by three witnesses at trial. After defendant testified as to her conduct and livelihood as a prostitute, the trial judge indicated his belief that admission of the photographs was not prejudicial. There was no abuse of discretion in the trial judge's consideration and admission of the photographs.

For the foregoing reasons the judgment of the circuit court of Cook County is hereby affirmed.

Affirmed.

GOLDBERG and McGLOON, JJ., concur.