THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMUEL WOLFE *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 84—0921, 84—1097 cons.

Opinion filed May 27, 1986.

James J. Doherty, Public Defender, of Chicago (Jeffrey M. Howard, Assistant Public Defender, of counsel), for appellant, Samuel Wolfe.

James B. Bell, of Chicago, for appellant Nathaniel Hart.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Mary Pat Butler, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

After a jury trial, defendants Samuel Wolfe and Nathaniel Hart were found guilty of murder and armed robbery and sentenced to concurrent sentences of 80 and 30 years. On appeal, they claim that the trial court abused its discretion in allowing each of them a total of only six peremptory challenges during *voir dire* examination of prospective jurors and in refusing to sever their cases from one another. Defendants also claim that the trial court erred in allowing improper prosecutorial remarks and trial testimony which denied them a fair trial. We affirm.

At trial, the State's chief witness, Jerry Levy, testified that at approximately 9 a.m. on February 8, 1983, he was drinking some wine behind the Fernwood Food and Liquor Store in Chicago. Levy heard several shots coming from the store and dropped to his knees. Levy was approximately 20 feet from the back door, hidden by a garbage can, when he saw both defendants Wolfe and Hart fleeing from the store. He stated that he recognized defendants from the neighborhood. Levy noticed defendant Wolfe carrying a bag and Hart carrying a bag as well as a gun which looked like a .45-caliber weapon. He heard coins clanking and noticed a can of beer drop as defendants fled. Defendants looked back at Levy as they ran. Once they were out of sight, Levy went into the store and saw an Arab known as "Tony" lying on the floor bleeding. Levy picked up a can of beer and ran home. He did not contact the police or anyone else that day.

Levy stated that two days after the occurrence, he was with his friend, Charlie Hite, and the two ran into defendant Wolfe. Wolfe told Levy "You know I ofted them Arabs, don't you?" then warned Levy that if he wasn't careful, Levy might not live until summer either. The jury was instructed to apply this conversation to defendant Wolfe only.

Levy further testified that he returned to Fernwood Liquors the following day and left his phone number with one of the clerks. He was subsequently contacted by the Chicago police department and identified both defendants from a photographic display as the men he saw fleeing from the store after the shootings. After testifying before a grand jury, Levy was given money to fly to Florida until defendants were brought to trial.

Expert testimony was then introduced to establish that one of the Arab clerks found in the store died as a result of gunshot wounds from a .45-caliber weapon and the other from a .32-caliber weapon.

Detective Robert Flood testified that after arresting defendants and advising each defendant of his rights, he interviewed each of them separately. At that time, Wolfe protested his innocence, claiming that Hart and Hart's brother, James, were the persons responsible. Thereafter, Hart was brought into the interview room where Wolfe was being held. According to Flood, Wolfe nodded affirmatively to questions regarding his previous testimony about the Hart brothers. On cross-examination, Flood admitted that the two defendants were brought together as a technique in order to get a statement from Hart.

Thirty minutes after the confrontation, after again advising him of his *Miranda* rights, Flood conducted a subsequent interview with Hart. At that time, Hart stated that his brother James had had nothing to do with the murders. Hart also stated that at 9 a.m. on the day of the murders Wolfe arrived at Hart's house armed with a gun and asked whether Hart was ready to rob the store. The two had discussed the robbery the previous day. Hart admitted getting his own gun and proceeding to the store with Wolfe, but claimed only to have acted as a lookout while Wolfe did the actual shooting.

Flood then confronted defendant Wolfe with Hart's statements. In response, Wolfe stated that he and Hart had planned the robbery at Hart's house and that Hart had suggested that they kill the Arabs because the Arabs knew them. Wolfe also stated that, at Hart's suggestion, the two left Hart's house to rob the store on the morning in question and that Hart had supplied Wolfe with a .32 revolver and had a .45 revolver for himself. Wolfe claimed that Hart's brother James was present throughout the conversation and had accompanied defendants to the store, but had left before anything happened. According to Wolfe, Hart pointed a gun at one of the two store clerks, while Wolfe ordered them to lie on the floor. Each defendant then emptied a cash register on opposite sides of the store. Wolfe claimed that while he waited in the back of the store, Hart took the gun from him and returned to the front of the store where he shot the clerks. During this statement, Wolfe accurately described the clothing of both victims.

Assistant State's Attorney William Merritt also testified. After advising defendant Wolfe of his rights, Merritt got a written statement from Wolfe, who told him that he did not want to be charged with murder because he did not want to shoot anyone, but only to rob

the Arabs. Wolfe's written statement corroborated his statement given earlier to Flood.

Merritt then read a written statement given by Hart. Hart's written statement differed slightly from his earlier statement and in it he denied having ever carried a gun on the morning of the murders.

Detective John Solecki testified that he also interviewed both defendants later that same evening. Solecki stated that after being advised of his *Miranda* rights, Hart told him that he, his brother and Wolfe had been discussing the robbery at the Hart's house on the morning in question. Each defendant had his own gun. The three proceeded to the store, but James Hart backed out and returned home. Hart stated that he and Wolfe entered the store, at which time Wolfe announced a robbery and fired shots at one of the victims. Hart then admitted firing shots at the other victim. After cleaning out the cash registers, defendants fled the store through the rear door.

A later interview was also conducted with Wolfe, who told Solecki that after returning from the liquor store, he had given the .32-caliber revolver back to Hart. He believed that both guns belonged to Hart and Hart's brother. During the reading of defendants' statements, the jury was repeatedly instructed that each statement could only be used as evidence against the person giving it.

Defendant Wolfe testified at trial, stating that on the morning of the murders, he left his home at 8 a.m. and was gone until approximately 11 a.m., during which time he was filling out employment applications at the Hardy Glass Company and at a new Zayre's store. He claimed that he learned about the murders upon returning from the second interview when he saw police outside the liquor store.

Wolfe claimed to have run into the Hart brothers three or four days after the murders. At that time, defendant Hart allegedly admitted to having shot the Arabs with his brother. Wolfe himself denied ever having planned the robbery or having taken part in the incident. While none of defendant Wolfe's witnesses could conclusively verify that Wolfe had actually applied for jobs in their companies on the day in question, Wolfe's uncle testified that he saw Wolfe in the vicinity where the Zayre interviews were taking place on that morning. In addition, a friend of defendant Hart's mother testified that she was at the Hart house on the morning in question but did not see defendant Wolfe there.

Defendant Hart then called his brother James to testify. James stated that he and defendant were home on the morning in question until 10 a.m., at which time they heard news that the Arabs had been shot. James denied ever having told the police that he, his brother

and defendant Wolfe had discussed the robbery ahead of time and denied having stated that they had talked about killing the Arabs who knew them. He also denied having given an earlier statement that he had accompanied defendants to the store but then backed out. James later admitted having made these same statements to the police, but claimed to have fabricated them.

Defendant Hart's mother then testified, stating that her sons were at home at the time of the murders and that no one in her home owned a gun.

In rebuttal, Detective Joseph Di'Giacomo testified that during an interview he had with James Hart on February 16, James admitted that he and defendants Hart and Wolfe had discussed the robbery prior to the murders, and that defendants stated they would have to kill the Arabs because they knew defendants. James claimed to have gone with defendants but to have backed out before anything happened. He did not learn about the murders until later that evening.

At the close of evidence, the jury was tendered instructions informing them that the statements from each defendant could only be used against the defendant making it.

On appeal, Wolfe argues that he was denied his constitutional right of confrontation, citing *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, when Hart's extrajudicial statements incriminating Wolfe were admitted at trial but Hart himself did not testify. In addition, both defendants assert that the antagonism inherent in their separate lines of defense prevented them from fairly being tried together.

After a lengthy hearing on defendants' motions to suppress oral and written statements, the trial court, on its own motions, ordered separate trials for defendants, based upon its belief that statements which were given by defendants implicated each other and denigrated their individual participation in two felony murders in a manner requiring severance. Upon the trial court's order, the State requested a hearing on whether severance was necessary, which the court granted, holding in abeyance its order to sever. During the subsequent hearing, the trial court reversed itself and reattached defendants for a single trial.

Initially, we note that defendant Wolfe failed to file any pretrial motion or severance and that both defendants failed to object at the time that the trial court reversed its own earlier decision. Defendant Hart's motion was not filed until the day before opening statements were to commence and the motion itself was vague in terms of the antagonism that would result from a joint trial, stating only that his

codefendant Wolfe would present a defense consistent with his previously admitted out-of-court statement which would inculpate Hart and that to deny the motion would create an atmosphere which would of necessity be antagonistic.

■ It is well settled that defendants jointly indicted are to be jointly tried unless fairness to one or both of them requires a separate trial to avoid prejudice. (*People v. Lee* (1981), 87 Ill. 2d 182, 187, 429 N.E.2d 461.) In seeking a separate trial, a defendant must do more than simply move for severance however; he must actively and specifically point out the antagonism of the defenses and thereby demonstrate the prejudice which will be suffered from a joint trial. (87 Ill. 2d 182, 189, 429 N.E.2d 461; *People v. Sanford* (1983), 116 Ill. App. 3d 834, 840, 452 N.E.2d 710, *appeal denied* (1983), 96 Ill. 2d 564, 452 N.E.2d 710.) The decision to grant a separate trial is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. 116 Ill. App. 3d 834, 840.

Defendants urge this court to overlook the obvious deficiencies in their pretrial pleadings, claiming that because the trial court had previously severed the cases, it "knew" before the commencement of trial both the specific antagonism of their defenses and that a true conflict existed between codefendants. They reason that the court erred, therefore, when it later reversed its own decision. Defendants attempt to bolster this argument by pointing to specific instances of "antagonism" that occurred at trial. Specifically, defendant Hart protests the trial testimony of defendant Wolfe during which Wolfe, and later Wolfe's counsel, pointed an accusatorial finger at Hart.

■ ■ We disagree with defendants' contention that the trial court's earlier actions somehow relieved defendants of their obligation to set forth sufficiently the specific antagonism of their defenses and the prejudice which would occur by a joint trial. (See *People v. Lee* (1981), 87 Ill. 2d 182, 189, 429 N.E.2d 461 (a defendant who fails to show the trial judge how he would be prejudiced by a joint trial cannot, on review, complain of the trial court's action in denying his motion).) Further, in evaluating the correctness of the trial court's ruling on a petition for severance, this court must look only to the allegations in the petition itself and is not to consider the subsequent happenings during the course of the trial. *People v. Edwards* (1984), 128 Ill. App. 3d 993, 471 N.E.2d 957, *appeal denied* (1985), 102 Ill. 2d 556; *People v. Columbo* (1983), 118 Ill. App. 3d 882, 939, 455 N.E.2d 773, *cert. denied* (1984), 467 U.S. 1208, 81 L. Ed. 2d 351, 104 S. Ct. 2394.

■ Based on the record before us, we believe that the trial

court's decision not to sever defendants' cases was proper. With respect to defendant Wolfe's contention, the prejudicial effect of a codefendant's extrajudicial statement was considered in *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132. There the Supreme Court held that the introduction of "interlocking confessions" with the proper cautionary instructions that the confession of one defendant cannot be considered as evidence of the guilt of the other does not violate a defendant's constitutional right to confrontation. Courts in this State have consistently invoked the exception as to interlocking statements where, as here, the pretrial statements of both defendants, which were properly before the jury, demonstrated the same crucial facts with respect to time, locality, felonious activity and overall plan, and differed only as to who acted as "lookout" and not as to defendants' participation. *People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525; *People v. Sanford* (1983), 116 Ill. App. 3d 834, 452 N.E.2d 710; *People v. Ross* (1985), 138 Ill. App. 3d 1089, 487 N.E.2d 68.

Similarly, the record does not support defendants' contention that their defenses were so antagonistic that a severance was imperative to assure a fair trial. As previously stated, defendants clearly fell short of their burden of bringing the feared prejudice to the trial court's attention prior to trial. Further, their defenses at trial consisted of separate alibis which, while different, were not antagonistic. We find this case to be distinguishable from those cases cited by defendants, in which the codefendants each made statements professing their own innocence while condemning the other (see *People v. Braune* (1936), 363 Ill. 551, 2 N.E.2d 839; *People v. Daughtery* (1984), 102 Ill. 2d 533, 468 N.E.2d 969), and where the only defense of one defendant was to convince the jury of his codefendant's guilt (*People v. Bean* (1985), 109 Ill. 2d 80, 95, 485 N.E.2d 349). In the instant case, the antagonism which existed at trial was not the result of inconsistent defenses, but rather, concerned codefendants' *pretrial* statements, in which Hart asserted that Wolfe was responsible for the murders and Wolfe claimed that it was Hart who did the shooting. The jury was properly instructed, however, to only use each defendants' statement against the defendant who made that confession. Under similar circumstances, the court in *People v. Cole* (1985), 131 Ill. App. 3d 36, 475 N.E.2d 620, *appeal denied* (1985), 106 Ill. 2d 556, found that no severance was required. We reach the same conclusion here. While we note that defendant Wolfe's testimony did include an allegedly self-incriminating statement made by Hart, we do not believe that the possible antagonism resulting from this statement war-

rants a different result, in light of defendants' own confessions, as well as the other evidence linking both defendants to the crime.

Defendants next contend that the trial court committed reversible error by allowing them only six peremptory challenges each during *voir dire* examination of prospective jurors when their case was a capital case. Section 115—4 of the Criminal Code of 1963 provides in pertinent part:

> "in a single trial of more than one defendant, each defendant shall be allowed 12 peremptory challenges in a capital case, 6 in a case in which the punishment may be imprisonment in the penitentiary, and 3 in all other cases." (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(e).)

■ In reply, the State cites this court's decision in *People v. Nathaniel* (1981), 103 Ill. App. 3d 610, 431 N.E.2d 1080, and maintains that because defendants waived a jury for the death penalty hearing, their case was no longer a "capital" case as far as the jury was concerned and they were no longer entitled to the number of challenges reserved for defendants who are subject to receiving capital punishment from a jury. We agree. In *Nathaniel*, the State was uncertain as to whether capital punishment would be sought, and therefore requested that the jury be *voir dire* under the guidelines of *Witherspoon v. Illinois* (1981), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The trial court refused to question the jury, however, and the State did not pursue the issue of death punishment after the trial court's decision. On appeal, the court recognized that the trial court's decision had eliminated the possibility that the defendant there could receive the death penalty and concluded that the cause was effectively no longer a "capital" case within the meaning of the statute. The court held that under those circumstances, defendant's right to the number of challenges reserved for capital cases was not prejudiced. *People v. Nathaniel* (1981), 103 Ill. App. 3d 610, 615, 431 N.E.2d 1080. See also *People v. Holmes* (1974), 19 Ill. App. 3d. 814, 313 N.E.2d 297, *appeal denied* (1974), 56 Ill. 2d 589.

We see no reason for a different conclusion here, merely because the State continued to seek death punishment from the court after the trial judge respected defendants' voluntary waiver of jury questioning, particularly where, as here, the death penalty was never applied. Further, we believe that in a situation such as the instant one, where it is no longer within the jury's province to sentence a defendant to capital punishment, the rationale behind the statute granting a greater number of peremptory challenges in a capital case simply does not apply. See *Swain v. Alabama* (1965), 380 U.S. 202, 219, 13

L. Ed. 2d 759, 772, 85 S. Ct. 824, 835 (the function of the challenge is "not only to eliminate the extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise").

Defendant Hart next argues that the trial court improperly admitted into evidence his statement which was secured through unconstitutional means. Specifically, he claims that immediately upon his arrest, he invoked both his right to remain silent and his right to counsel, and that he was then improperly confronted with defendant Wolfe's statements incriminating him in the murders before ever having waived those rights.

We first note that the testimony presented by the State at defendants' suppression hearing—which the trial court found to be more credible than that of defendant—made clear that defendant invoked only his right to remain silent upon his arrest. Further, defendant himself testified at the hearing that while he was in the interview room with Wolfe, he only heard Wolfe cry and that Wolfe was not questioned about any murders during that time. Hart also stated that it was between a half-hour and an hour after seeing Wolfe, and after again being advised of his rights, that he began speaking to police, and that his decision at that time was motivated by fear that his brother James was being implicated in the crimes.

■ We need not reach the voluntariness of the objected-to statement, however, because we find that the record establishes the admissibility of his subsequent statements which were reduced to writing. Where a defendant has received fresh warnings and a significant period of time has elapsed since the illegal questioning, this court has held that defendants' responses to the subsequent questioning may be voluntary and not tainted by prior illegal questioning. *People v. Colley* (1980), 83 Ill. App. 3d 834, 841, 404 N.E.2d 378, *appeal denied* (1980), 81 Ill. 2d 595.

Defendant Hart provided a written court-reported statement at 3:30 p.m., more than four hours after invoking his right to remain silent. Later that evening, after again being advised of his rights, Hart gave an even more incriminating statement to Detective Solecki, at which time Hart admitted having shot one of the clerks himself. We believe that where, as here, defendant had a sufficient period of time to reassess his decision to remain silent, then gave subsequent voluntary statements which substantially corroborated his earlier statements, any possible error in the admission of the first statement was harmless.

■ Defendant Wolfe next claims that reversible error occurred where the assistant State's Attorney was allowed to testify regarding the duties of a felony-review assistant, and where, during trial, the State caused the jurors to shift the burden of proof to defendant, draw inferences which were not legitimate, consider matters not in evidence, and affiliate defendant with a gang. Both defendants also claim that they were denied fair trials where the State argued facts and opinions in closing which suggested great improprieties on the part of defendants' counsel.

The State points out that the majority of these alleged errors were not properly preserved for review where defendants failed to raise them with specificity in their post-trial motions (*People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091), and that in cases where defendants were not deprived of a fair trial and the evidence is not closely balanced, there is no reason to depart from the waiver rule (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856). We agree, however, in view of the number of alleged errors and the gravity of their potential impact, we have carefully reviewed the record with respect to each defendants' allegations.

While we do not approve of several of the State's comments, we find that the alleged errors were, for the most part, either invited reply to improper comments in defendants' closing arguments, or the provoked response to arguments raised by defendants during trial. Further, in light of the evidence presented, we find that defendants have failed to demonstrate that the alleged errors unduly influenced the jury so as to constitute a material factor in their convictions. See *People v. Smylie* (1981), 103 Ill. App. 3d 679, 431 N.E.2d 1130, *appeal denied* (1982), 91 Ill. 2d 564.

Based on the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, P.J., and QUINLAN, J., concur.