THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOSE APONTE, Defendant-Appellant.

First District (4th Division)   No. 62524

Opinion filed January 27, 1977.

James J. Doherty, Public Defender, of Chicago (Frances G. Sowa and Donald S. Honchell, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Michael E. Shabat, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Jose Aponte, the defendant, was arrested on May 16, 1973. He was charged with the criminal offense of arson, in violation of section 20—1(a) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 20—1(a)). Subsequent to a jury trial held in the Circuit Court of Cook County, County Department, Criminal Division, the defendant was convicted of the offense charged and was sentenced to serve a period of incarceration in the Illinois State Penitentiary for a period of not less than 3 years and not more than 10 years. The defendant's motions for a judgment of acquittal notwithstanding the verdict, an arrest of judgment, and for a new trial were all denied. The defendant appeals.

The issues presented for review are (1) whether the defendant was proved guilty of arson beyond a reasonable doubt; (2) whether the

defendant waived for purposes of appeal any objection relating to the admission of testimony regarding his alleged threats to commit arson by his failure to challenge such testimony in his written motion for new trial; (3) whether such testimony was properly admitted into evidence at trial; and (4) whether the trial court erred in admitting into evidence and sending to the jury certain photographs.

On May 10, 1973, a garage owned by Walter Stawicki, located at 3250 West Division Street in Chicago, burned to the ground. The garage was rented to Mr. Sylvester Bell for the purpose of storing his car, a 1963 Chevrolet, which was also destroyed in the garage fire. Stawicki estimated that at the time of the fire the garage had a value of $1800.

Charles Maclin testified that on May 10, 1973, he resided at 3242 West Division, four doors away from the burned garage. His sister, Isella Maclin, also lived on West Division Street, in the rear of number 3244. At approximately 1 p.m. on the above date, Charles and Isella were in front of his residence. At this time the defendant, known to Charles as "Shorty," approached the Maclins; he was accompanied by five of his friends. The defendant then directed a verbal threat at the Maclins, informing them that they would be burned out that night. The defendant made reference to the race of the Maclins in his threat. When the witness responded, "Come on," to him, the defendant turned and walked away. Mr. Maclin saw a fire in the rear of 3244 at approximately 11:30 p.m. that night, but did not see anyone set the fire.

Isella Maclin corroborated the testimony of her brother. On the afternoon of May 10, she was on her mother's front porch watching her children who were outside playing. The defendant then approached Isella and her brother and threatened them. That evening, at approximately 11 or 11:30 p.m., while watching television in her home, Isella heard the dogs barking. When they continued to bark, she went into her children's room to check on them. She testified it was then that she saw a "flare up" coming from her kitchen window. She returned to the couch to watch television, sat down and then saw a flame. Isella stated that when she sat down to watch television, the garage was not on fire; it was on fire when she saw the flame. She then went to her kitchen window to look outside, where she saw "Shorty," whom she later identified as the defendant, pouring something on the garage located between Stawicki's garage and her home. According to the witness, the defendant was "pouring something down side the garage. Then I made a funny move and he laid the gas down." Isella described the defendant as wearing a light colored tee shirt, black suspenders and black pants. She saw the defendant light a match. A flame "came up" and he threw the match into a garbage can. The defendant then ran towards Spaulding Street. Isella proceeded to gather her children and exit from her home. She and the

children went to her mother's house. Isella later saw the defendant on the corner, wearing the same clothes. She told firemen that she had seen the man who had planted the fire and pointed out the defendant to them.

On May 16, 1973, police investigators questioned Isella Maclin about the garage fire. The officers showed Isella six photographs. One of the photographs depicted the defendant, Jose Aponte. Ms. Maclin then identified the defendant as the man she had seen from her kitchen window on the night of the fire. As the officers escorted the witness from the offices of the Gang Crime Investigation Division of the Chicago Police Department, where she had given them a written statement, Isella noticed the defendant standing on a street corner. Again, she pointed him out to the officers. Later that evening, at approximately 11 p.m., the defendant was arrested.

The defendant denied having seen Isella Maclin at any time on May 10, 1973, and testified that he spent that afternoon with friends. According to the defendant, at approximately 12:30 that afternoon he arrived at the home of Wilfredo Soto where he remained for 25 minutes. He and Soto then drove to Humbolt Park where they parked Soto's vehicle and waited for another friend, Jimmy Santiago. After Santiago arrived, the friends lingered for 20 minutes discussing how they would divide the cost of some beer. The defendant left the park twice during the day, at approximately 2 p.m. and 5 p.m., to get beer. He returned after each trip and consumed the liquor. The defendant did not leave the park for the evening until 6 p.m. Aponte then went to the home of his former girl friend's mother; Soto accompanied him. The defendant's grandmother, his girl friend, and her mother were all present at the home. When Soto returned at 7 p.m., after having gone to his own home for dinner, Aponte informed him that his grandmother had fainted. He asked Soto to help him find his father. At 7:30 p.m., the defendant took his grandmother to a hospital where he remained until 10 p.m. He was accompanied the entire time by Wilfredo Soto, his father, his girl friend, and her mother. When the family left the hospital, they took the grandmother to the home of the defendant's aunt, Guillermina Rivera. The defendant remained at his aunt's home for "15 or 20 minutes." Soto, the defendant's girl friend, and her mother waited outside for the defendant in Soto's car. Aponte then returned to the car. Soto first drove the girl's mother to her home and then took Aponte and his girl friend to the defendant's home at approximately 11 p.m. Soto did not enter the defendant's home. The defendant testified that prior to his arrest, he was not aware that the garage at 3250 West Division had been destroyed. The defendant's testimony was substantially corroborated by defense witnesses Wilfredo Soto and Guillermina Rivera.

The defendant further testified that he had been threatened and shot at

on October 13, 1974, by Isella Maclin. According to the defendant, on that date he and a friend, George Rios, went to the liquor store located at 3251 West Division. Isella Maclin and another girl were in the store. Isella attempted to bump the defendant as she passed by him. She began swearing at the defendant and said, "You dead, boy. You a dead MF." When Aponte questioned Isella, she responded, "You know what I mean by that. You were there Friday night when they shot my brother." She then accused him of shooting her brother. The defendant told her, "Get off my back," and walked out of the store. Isella came out behind the defendant and said to him, "Step it off, boy. You better step it off." Aponte and Rios continued walking for half a block and then heard shots being fired. The two men ran into the hallway of a building. They were not injured. Aponte stated that he did not see a gun in Isella's hand inside of the store, and that he never saw anyone with a hand raised to fire a gun. He never turned around to see where the bullets came from and did not know where they struck.

George Rios testified that he and the defendant were in a liquor store on October 13, 1974; that two women entered the store and one of them, whom he could identify, threatened Jose Aponte. According to Rios, the woman accused Aponte of shooting her brother. After Rios and Aponte had left the store and walked a distance of half a block, a shot was fired. Rios then looked in the direction of the liquor store and saw the woman standing outside of the store with her hand raised. He did not see a weapon in her hand. The witness stated that he could recognize the sound of gunfire because he had heard that sound before. Rios did not know the name of the woman who had shot at him.

Isella Maclin testified that she and a friend did go to a tavern on October 13, but denied that she saw the defendant at that time. Ms. Maclin further denied that she had threatened Aponte, accused him of shooting her brother, or fired a weapon at him.

Aponte stated that on the same day Isella shot at him, October 13, 1974, he was arrested for allegedly shooting her brother. According to the defendant, he was arrested because Isella informed the police that he had shot her brother. He testified that after he was taken into custody by police officers, they took him to the home of Isella Maclin where she identified him and again accused him of the shooting. After further investigation, the defendant was released.

Maria Cruz, mother of the defendant's present girl friend and grandmother of his child, appeared as a witness for the defense. On May 10, 1973, Ms. Cruz resided at 3247 Crystal Street. She stated that her home was almost directly across from the burned garage on the opposite side of the alley. That evening, at approximately 11 p.m., she was walking home after having visited with a neighbor. She stopped on the sidewalk in front

of her home when she saw two boys running. The boys carried a yellow and red can that was at least 18 inches wide. Ms. Cruz entered her home and immediately saw smoke coming from the garage. The witness testified that she could see everything that occurred in the alley from the windows of her home, and that she saw two boys talking in the alley. She was familiar with only one of them, whom she identified as a youth by the name of Tarzan, and was able to describe him. She did not pay attention to the other youth and stated only that he was thin. Ms. Cruz stated that she did not see Jose Aponte at any time that night. She admitted not being acquainted with the defendant at the time of the incident.

After the fire, Ms. Cruz did not inform anyone of what she had witnessed. She testified that she was afraid of Tarzan and for that reason did not go to the police. She revealed her information to the defendant after she learned that he had been charged with arson and after the death of the youth named Tarzan. Ms. Cruz stated that she did not want to see the father of her grandchild go to jail.

The defendant first argues that the State failed to present evidence sufficient to prove him guilty of arson (Ill. Rev. Stat. 1971, ch. 38, par. 20—1(a)), beyond a reasonable doubt, that the verdict was against the manifest weight of the evidence, and that his conviction should therefore be reversed. The offense of arson under section 20—1(a) of the Criminal Code is committed by a person when "* * * by means of fire or explosive, he knowingly: (a) Damages any real property, or any personal property having a value of $150 or more, of another without his consent; * * *." According to the defendant, the evidence presented by the State was incompetent, incredible, and therefore insufficient to establish beyond a reasonable doubt that he knowingly set fire to Stawicki's garage, or that the garage fire resulted from an incendiary act. The defendant maintains that the State failed to meet the burden of proof required by law when it did not introduce evidence, independent of eyewitness testimony, that the burning of the involved property resulted from an act of arson. We do not agree.

■■ Where the offense of arson is charged, the corpus delicti consists of two elements: (1) that a certain result occurred and (2) that some person is criminally responsible for the act. (*People v. Lueder* (1954), 3 Ill. 2d 487, 489, 121 N.E.2d 743.) It is elementary that the mere fact that a building has burned does not prove the incendiary nature of the fire. However, the law does not require that the corpus delicti of a crime be established by evidence completely independent of that which tends to connect the accused with the crime. (*People v. Nachowicz* (1930), 340 Ill. 480, 495, 172 N.E. 812; *People v. Hougas* (1968), 91 Ill. App. 2d 246, 249, 234 N.E.2d 63.) In the instant case, the State was not required to offer expert testimony as to the cause and origin of the fire. The State's witness,

Isella Maclin, testified that she saw the defendant set fire to the garage next door.

■■ The defendant cites *People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96, in support of his contention that a review of the evidence requires a reversal of his conviction. The Illinois Supreme Court stated in that opinion: "* * *[I]t is always the duty of this court to examine the evidence in a criminal case, and if it is so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt the conviction will be reversed." The defendant challenges the testimony of the State's witness, Isella Maclin. Isella was the single witness who viewed the actual commission of the crime. She testified that she saw the defendant set fire to the garage, and that on a prior occasion he had threatened to burn her and her family out of their homes. The defendant denied both accusations and produced evidence tending to establish an alibi. He offered further evidence in an attempt to convince the jury that the witness was unfavorably biased against him, and thus impeach her testimony. The record reveals that sometime after the arson, Isella accused the defendant of shooting her brother, that the defendant was arrested for that crime, and that he was subsequently released. The defendant contends that this evidence conclusively established bias on the part of the witness, and, therefore, the jury could not have acted reasonably when it found him guilty of arson. The defendant also contends that Isella's statements were so laden with inconsistencies as to render her testimony incredible. We do not agree.

It is not apparent that Jose Aponte was the victim of any injustice. In a criminal case, the weight to be given testimony relating to the identity of the accused is to be determined by the trier of fact, and the uncorroborated testimony of one credible witness can be sufficient to sustain a conviction, even when contradicted by the accused. (*People v. Anthony* (1963), 28 Ill. 2d 65, 69, 190 N.E.2d 837; *People v. Williams* (1968), 104 Ill. App. 2d 329, 333, 244 N.E.2d 347.) Isella Maclin was positive in her identification of the defendant and on all material matters. Her testimony remained unwavering on cross-examination. The testimony of Isella Maclin was strengthened in that it was corroborated in part by the testimony of her brother, Charles Maclin. Charles testified that the defendant had threatened to use fire as a weapon against the Maclin family. The testimony of an already credible single witness becomes particularly adequate where it is corroborated in part by the testimony of another witness. *People v. Guido* (1962), 25 Ill. 2d 204, 209, 184 N.E.2d 858.

■■■ The Illinois Supreme Court held in *People v. Coulson* (1958), 13 Ill. 2d 290, 295-96, 149 N.E.2d 96, that when the evidence pertinent to the material facts in issue is conflicting and cannot be reconciled, "* * * it is

the duty of a jury, or of a court sitting without a jury, to determine the credibility of the witnesses and the weight to be given their testimony, and on review, this court will not substitute its judgment for that of the jury or trial court." The supreme court stated in *People v. Guido* (1962), 25 Ill. 2d 204, 208, 184 N.E.2d 858, that: "A conviction will not be set aside merely because the evidence is contradictory, and a conviction depending upon the weight of the evidence will not be set aside except to prevent an apparent injustice." If there were inconsistencies in the testimony of Isella Maclin, such inconsistencies were not sufficient to render her testimony improbable, incredible, or to warrant reversal of the defendant's conviction. The evidence supports fully the determination of the trier of fact.

The defendant next argues that the trial court committed prejudicial error when it allowed the State's witnesses to testify that defendant had threatened them with arson; such testimony was not competent evidence and served only to prejudice the jury, since the State failed to introduce evidence that an attempt was made to destroy property actually occupied by the Maclins. According to the defendant, in order to render the testimony regarding alleged threats to commit the crime charged competent evidence on the question of intent, the State had a duty to show that the actual victim, Mr. Stawicki, was within the scope of the threats. The defendant cites *Bird v. United States* (1901), 180 U.S. 356, 45 L. Ed. 570, and *People v. Scott* (1918), 284 Ill. 465, 120 N.E. 553, as authority. The defendant maintains that he was deprived of a fair trial and requests that the conviction be reversed and a new trial granted. However, the defendant did not raise this issue in the trial court; he failed to mention the specific issue objected to on review in his written motion for a new trial. The State contends that the defendant waived his right to raise on appeal the question of whether or not the admission of such testimony constituted reversible error and denied him a fair trial. We must agree.

We find that the waiver rule promulgated by the Illinois Supreme Court in *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856, is dispositive of this issue. The supreme court held the law to be as follows: "Failure to raise an issue in the written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a ground for reversal on review." Issues of constitutional magnitude were before the court in *Pickett*. The defendant therein, having failed to mention the specific issues objected to on review in his written motion for a new trial, argued on appeal that he had been denied his constitutional right to poll the jury and his right to counsel at a critical stage of the trial proceedings. The supreme court held that the general waiver rule " * * * applied to constitutional questions as well as to other issues." Although, under Supreme Court Rule 615(a) (Ill.

Rev. Stat. 1973, ch. 110A, par. 615(a)), a reviewing court may in its discretion consider issues not properly preserved for review, where a defendant was denied a fair and impartial trial, the rule " * * * does not mandate that a reviewing court consider all errors involving substantial rights whether or not the same have been brought to the attention of the trial court." *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.

■■  We find that the defendant has waived for purposes of appeal, the issue of whether or not certain testimony was properly admitted into evidence at trial.

Finally, the defendant argues that the trial court committed prejudicial error when it admitted and sent to the jury certain "mug shots" depicting the defendant, since the photographs were not relevant to the material issues and indicated to the jury that he had been previously arrested. The State contends that the photographs were not prejudicial to the defendant and were sufficiently altered so as not to convey any evidence of prior arrests. Thus, the admission of the photographs by the trial court did not constitute reversible error.

The photographs in question were selected by Isella Maclin from among others shown to her by police officers. It was after she identified Jose Aponte from his photograph that the officers learned the defendant's proper name. The photographs were indeed "mug shots"; they depicted a frontal and side view of the head of the defendant. In compliance with instructions given by the trial court, the photographs were altered prior to their admission into evidence. Evidence of the police department's identification placard was removed, police numbers were cut from the bottoms and a full length view of the defendant was omitted entirely. The defendant maintains, however, that the photographs remained extremely prejudicial, since a juror of average intelligence would know that they were "mug shots." Further, there was no issue of misidentification in the instant case to which the pictures may have been relevant. The defendant cites *People v. Murdock* (1968), 39 Ill. 2d 553, 562, 237 N.E.2d 442, as holding that "mug shots" of a defendant are erroneously admitted into evidence where there is no purpose for their admission, since such pictures could suggest to a jury that the defendant had been previously arrested.

The Illinois Supreme Court held in *Murdock* that the admission into evidence of "mug shots" depicting the defendant taken from police files is erroneous, where no probative purpose is advanced by their admission. The court did not determine, however, whether or not such evidence alone would be so prejudicial as to require a reversal of the conviction and a new trial. The Illinois Appellate Court has held that police "mug shots" may be properly introduced into evidence " * * * where they are being admitted for the purpose of showing how defendants could have

been accurately identified from them and not merely for the purpose of prejudicing the jury by showing prior unrelated encounters with the police." (*People v. Adams* (1974), 22 Ill. App. 3d 665, 669, 318 N.E.2d 278.) The defendants in *Adams* attacked on appeal the fairness of the identification procedures employed by the police. In *People v. Purnell* (1969), 105 Ill. App. 2d 419, 422-23, 245 N.E.2d 635, the defendant raised the issue of whether or not his conviction was based solely on the less than reliable testimony of one witness. He asserted that in view of the vague and uncertain testimony delivered by the complaining witness, his alibi defense should be given greater consideration by the court. The court held that a police photograph of the defendant bearing the legend "Police Department, Maywood, Ill. 3458," was properly admitted, since the legend complained of did not indicate a conviction of a crime and the photograph was offered to show identification rather than to evidence prior arrests. In *People v. Mitchell* (1975), 34 Ill. App. 3d 311, 318, 340 N.E.2d 226, the defendant argued that reversible error had occurred when the complainant was allowed to testify that she had identified the defendant after viewing two albums of police photographs and then selecting his picture from the albums. The accused contended that this testimony clearly suggested to the jury that he had a police record of prior arrests. The court held that the admission of testimony concerning police photographs depicting the defendant is not error, since "Utilization of photographs in the identification procedure is a proper method of police investigations" and " * * * use of police photographs for identification purposes has long been upheld." *People v. Mitchell* (1975), 34 Ill. App. 3d 311, 318, 340 N.E.2d 226.

■■ We believe that in the instant case, the admitted photographs were relevant to the question of identification. The defendant, Jose Aponte, questions the veracity of Isella Maclin's testimony. He characterizes her testimony as being vague, confused, and inaccurate. He has attempted to impeach her testimony with evidence that she may have been biased against him when she picked him out as the arsonist. The defendant is contending that the fact that Isella had seen him in the neighborhood on various prior occasions weakens her testimony and raises question as to the validity of her identification of the defendant. Mr. Aponte asserted an alibi defense at trial and denies that Isella Maclin correctly described and identified him as the man she witnessed set fire to the garage. Isella testified and was cross-examined in great detail regarding the events that followed the fire, her interaction with the arresting officers, and the identification procedure utilized.

■■ We find that admission of the photographs did not deprive the defendant of a fair and impartial trial, and did not constitute reversible error. All potentially prejudicial matter was stricken from the

photographs prior to their admission; they did not indicate to the jury a conviction of a prior crime; and the term "mug shots" was never applied to the photographs within the hearing of the jury. Further, both Isella Maclin and Officer Shields had already properly testified that Isella had identified the defendant from photographs shown to her by police officers. *People v. Mitchell* (1975), 34 Ill. App. 3d 311, 318, 340 N.E.2d 226.

In accordance with the above findings, the conviction of the defendant for the offense of arson is affirmed.

Affirmed.

DIERINGER, P. J., and SIMON, J., concur.