THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THOMAS ARMSTRONG *et al.*, Defendants-Appellants.

Fourth District   No. 14570

Opinion filed June 2, 1978.

Richard J. Wilson and Donald T. McDougall, both of State Appellate Defender's Office, of Springfield, for appellants.

Paul L. Stone, State's Attorney, of Sullivan, for the People.

Mr. JUSTICE MILLS delivered the opinion of the court:

The conclusion first: We affirm.

All three defendants were convicted of armed robbery by a Moultrie County jury. Armstrong was sentenced to 4 to 12 years' imprisonment, Davis received 10 to 30 years, and Erbes got 6 to 18.

Four issues are before us:

(1) Whether Armstrong and Erbes are guilty beyond a reasonable doubt.

(2) Whether Davis is guilty on an accountability theory beyond a reasonable doubt.

(3) Whether Davis was denied a fair trial by the admission of testimony describing a photograph of him and his young son posing with handguns.

(4) Whether the trial court abused its discretion by imposing excessive sentences.

Now for the facts. They are complex, and we find it needful to tell them in somewhat exhausting detail.

During the middle of the afternoon on February 25, 1977, two men carrying handguns robbed the Star Market in Bethany, Illinois (a community of some 1,200 population), of an amount of money described by the prosecutor at trial as $581. The robbers were attired in blue jeans, dark shirts or jackets, and dark knit ski masks. The witnesses unfolded the following story.

Darlene Cuttill approached and entered the market just prior to the robbery at which time she observed two men outside near some vending machines. Before leaving her car, she observed the two suspicious men

for approximately 1½ minutes as they stood beside some frequently vandalized vending machines. Although the men had their backs to her, they both turned around and looked toward her as she entered the market. The men were dressed in blue jeans, dark shirts and jackets, and their faces were uncovered. Moments later, two similarly dressed men wearing ski masks and carrying guns entered the market and robbed it. The two robbers appeared to be wearing the same clothing as the two men she saw outside the building. She identified Erbes at trial as one of the men she observed outside the market based on his build and the length and color of his hair. She could not recall his having a moustache. She did say, however, that she viewed a lineup on the evening of the robbery and was unable to pick out the second participant in the robbery. On cross-examination she admitted that in a prior conversation with defense counsel she told him that she was unable to identify the men standing near the vending machines. She then stated that she was not positive of her in-court identification of Erbes, that (in her pretrial conversation with defense counsel) she had told him she did not make a full-face observation of the men standing next to the machines and that she only remembered them wearing jeans, not shirts or jackets. She further admitted that she could not say for certain that the two men standing outside the market were the two who perpetrated the armed robbery. Although she had picked Erbes out of a lineup at the jail on the evening of the robbery, on cross-examination she said she was not certain that that identification was correct, although she said, "I thought I was pretty sure." On redirect she stated she "thought they were the same" men.

Hillis Miller was working in the market's meat department at the time of the robbery. On the evening following the robbery, she picked Armstrong out of a lineup as one of the masked men who robbed the market. She said her identification was based on his clothing and facial characteristics. On cross-examination, however, she admitted that she previously had told defense counsel that she could not positively identify any of the robbers, that she did not observe the robber's face and that she couldn't recall whether he had a jacket, T-shirt or sweater on at the time of the robbery. She identified Armstrong as one of the robbers because she saw him at the lineup which was, as she said, "The only place I know for sure that I seen [sic] him." She also testified that she really did not know who perpetrated the robbery at the Bethany Star Market. On redirect she denied that any police officer prompted her to identify Armstrong out of the lineup.

Marna Goetz was the market employee who emptied the cash register for the robbers. She testified that a State trooper asked her after the

robbery if Homer Davis was one of the robbers. She answered in the negative.

Doris Wheeler (a customer), just prior to the robbery and just as Mrs. Cuttill pulled up in front of the Bethany Star Market, left the market and rode from the scene in her daughter's automobile. The Wheeler vehicle proceeded eastward on West South Water Street to Washington Street. At that intersection she observed a black, 1969 automobile which turned east onto West South Water Street, the street on which the market is located. She glimpsed the profile of the driver, but she did not see anyone else in the car. When she learned of the robbery, she returned to the market and told an investigating State trooper that she observed an unfamiliar car in Bethany that day. The trooper showed her five photographs and she picked out a photograph of Davis as the driver of the unfamiliar vehicle and identified him at trial as the driver.

Jacques and Leola Scott were parked outside the Bethany Star Market at the time of the robbery. She observed two men wearing ski masks leaving the market just before Mrs. Cuttill rushed out of the building saying, "We have been robbed." After the robbers were out of sight, the Scotts started their car and began driving around Bethany in search of the robbers. The Scotts headed south on then-deserted Washington Street and eventually encountered two men in a dark, northbound car bearing license number 451-739. As they circled around the area, they encountered the car three times and each time Mr. Scott observed the driver and identified him in court as Homer Davis. Mr. Scott is a lawyer who had Homer Davis as a client approximately 5 years previously. (Mr. Scott had not seen Davis since then and did not recognize the driver as Davis until the Sunday evening following the robbery when a State trooper displayed some photographs to Scott who had selected a photograph of Homer Davis, and the trooper told him the man he picked was named Homer Davis.) As they drove around Bethany, the Scotts also observed a beige car parked near the dark car which Davis allegedly had been driving which was now parked. Men were getting out of one of the cars and into the other. Mrs. Scott wrote down the beige car's license number and Mr. Scott identified a black and white photograph of the beige car. The caption on the back of the photograph described the car as a "Brown Barracuda" and the rear license plate on the car was a 1976 Illinois plate bearing the number EU 1209. On cross-examination, Mrs. Scott said she did not know how many people got out of the two parked cars and she could not identify their sexes. Her husband also testified on cross-examination that he only saw two individuals at any one time in the dark and beige cars.

Wanda Barker observed a brown Barracuda parked in front of her

home on the day of the robbery. At approximately 2:45 p.m., a dark Chrysler squealed around her corner and stopped near the Barracuda. Two men in their teens or early twenties exited from the dark car and entered the Barracuda. She identified Armstrong in a lineup and in court as one of the two men, based on the length and color of the man's hair and his build. Armstrong, she said, was unmasked and dressed in blue jeans and a brown T-shirt. One of the men was carrying a brown paper sack. On cross-examination, she admitted she previously told defense counsel she was unable to identify any of the individuals she had seen. She was not *positive* of her identification of Armstrong and she appeared to say that her identification was based on her general recollection of the man. On redirect she was asked, "What did you mean when you told him you couldn't identify the people?" Her reply: "That I couldn't stake my life on it. I couldn't be one hundred per cent sure."

Gene Faith, an Illinois State Police officer, testified that he investigated the armed robbery of the Bethany Star Market immediately after it occurred. The next day he executed a search warrant at Davis' trailer in Bethany where the police were searching for ski masks, guns, and a brown paper bag. However, they only discovered ammunition for a .38-caliber pistol and a picture of Davis and a small boy holding two dark-colored handguns. Although the photograph was neither introduced into evidence nor displayed to the jury, Officer Faith did describe the photograph to the jury over objection.

Roger Shelton, a deputy sheriff, testified that he stopped Davis' car (a black Dodge Polara bearing license number 451-739) on the day of the robbery at approximately 3:31 p.m., in Mt. Zion, Illinois. Davis was driving and his wife and small child were with him. After Deputy Shelton contacted Trooper Faith, Davis and his family were released at 4:12 p.m. Before that, however, Shelton searched the Davis car, finding no ski masks, guns, or money.

Charles Applegate, a Mattoon policeman, stopped a brown 1965 Barracuda bearing what Applegate thought was license number EU 1209 on the west edge of Mattoon at 3:30 p.m. on the day of the robbery. Armstrong was driving and Erbes was a passenger.

Harold Morgan, another deputy sheriff, searched the Barracuda at the Mattoon Police Station after Armstrong consented to the search. State Trooper Jack Eckarty had told Morgan that Armstrong said some money could be found hidden beneath the dashboard. Indeed, Morgan found $380 there. (After the money was found, Armstrong told Eckarty that he had withdrawn the money from his credit union and had lent it out to a number of persons whose names he could not recall.)

First issue: *Were Armstrong and Erbes guilty beyond a reasonable doubt?*

■ In *People v. Harris* (1975), 34 Ill. App. 3d 906, 908, 340 N.E.2d 327, 329, we stated that "\* \* \* a jury's verdict will be reversed on grounds of insufficient evidence where there is a reasonable and well founded doubt of guilt and the verdict is found to be palpably contrary to the weight of the evidence." (Accord, *People v. Zuniga* (1973), 53 Ill. 2d 550, 559, 293 N.E.2d 595, 600; *People v. Love* (1978), 71 Ill. 2d 74, 373 N.E.2d 1312; *People v. Frost* (1977), 47 Ill. App. 3d 767, 771, 362 N.E.2d 417, 419.) The *Harris* standard is the proper yardstick for the first issue confronting us.

The testimony against Erbes and Armstrong which is most incriminating is that of Darlene Cuttill, Hillis Miller, and Wanda Barker. Cuttill definitely identified Erbes as one of the robbers, but that identification was contradicted by her responses on cross-examination and then somewhat shored up on redirect. Miller definitely identified Armstrong on direct examination, although she, too, wavered under cross-examination and then on redirect denied being prompted at the lineup. Barker identified Armstrong as being dressed similarly to the robbers, as carrying a brown paper bag soon after the robbery, and as entering the brown Barracuda near the market. She, too, somewhat weakened her definite identification on cross-examination, although she more fully explained her answers on redirect.

It is the jury, of course, who is given the responsibility for determining the credibility of witnesses and it is not within our province to interfere unless their view clearly violates the evidence's manifest weight. *E.g., People v. Abbott* (1977), 55 Ill. App. 3d 21, 370 N.E.2d 286; *People v. Tomer* (1973), 15 Ill. App. 3d 309, 304 N.E.2d 129; *People v. Aponte* (1977), 45 Ill. App. 3d 1030, 360 N.E.2d 424.

■■ The witnesses here made positive and unequivocal identification of both Erbes and Armstrong in their direct testimony, but retrenched after a most thorough and withering cross-examination. The blistering cross to which they were subjected obviously weakened the effect of their otherwise definite identification of the defendants. But each witness was then redirectly examined by the prosecution and in each instance their answers—to some degree—swung back again. And the jury heard it all.

As our supreme court opined in *People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733, 734-35:

> "This court has often held that it is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence. (*People v. Zuniga* (1973), 53 Ill. 2d 550; *People v. Hurst* (1969), 42 Ill. 2d 217.) Where the evidence is merely conflicting a court of review will not substitute its judgment for that of the trier of fact. *People v. Clark* (1964), 30 Ill. 2d 216."

The defense cites *People v. Cullotta* (1965), 32 Ill. 2d 502, 207 N.E.2d

444, for the proposition that a conviction which rests on vague, uncertain and doubtful identification testimony cannot stand. *Cullotta*, however, dealt with an entirely different factual situation involving police officers being afforded only a fleeting view of defendants in a laundromat as they drove by in patrol cars at night when it was snowing. The factual situation in the instant appeal could hardly be more distinguishable: It was broad daylight, none of the witnesses were in moving vehicles, it was not snowing, the weather was not obstructing vision, and none of the witnesses had merely a "fleeting view" of the defendants. The case is simply inapplicable.

Second issue: *Was Davis guilty on an accountability theory?*

Our criminal law says:

"A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c).)

As to Davis in the instant case, the testimony of the Scotts is crucial. Mrs. Scott wrote down Davis' license number and Mr. Scott said he observed Davis' face on three occasions as they drove past Davis' car. The critical testimony linking Davis to Erbes and Armstrong involves Mr. Scott's observation of the Davis car parked next to the beige car. In addition, even though he previously had Davis as a client, Mr. Scott did not recognize Davis as the driver of the dark car until a police officer told him two days after the crime that the photograph he had selected from a photographic array was that of Davis.

But if Mr. Scott's testimony linking Davis' car (and hence Davis) to Erbes' and Armstrong's escape car (*i.e.*, the beige car) is credible, then there is no question but that the State proved Davis accountable for the armed robbery. If Davis assisted in Erbes' and Armstrong's escape, then he (1) aided their commission of the crime; (2) at the time the offenses were committed; and (3) the mere fact that he aided in their escape is evidence of his specific intent to facilitate the commission of the crime. *People v. Owens* (1975), 32 Ill. App. 3d 893, 895, 337 N.E.2d 60, 62; *People v. Tillman* (1971), 130 Ill. App. 2d 743, 749-50, 265 N.E.2d 904, 909; *People v. Morrison* (1977), 53 Ill. App. 3d 843, 368 N.E.2d 1325, 1327-28; *cf. People v. Richardson* (1965), 32 Ill. 2d 472, 476, 207 N.E.2d 478, 481 ("* * * proof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commission of an act by a group").

■■ Here—again—we are guided by *Atkis, Tomer, Abbott,* and *Aponte.*

Credibility and weight are for the jury—not us, unless the manifest weight is palpably violated. And we cannot so conclude here. It remained a jury question and the jury answered.

Third issue: *Was Davis denied a fair trial by the testimony describing a photograph of him and his young son posing with handguns?*

The only foundation for permitting Officer Faith's testimony was the testimony of Mrs. Cuttill who said the handguns used in the robbery were "dark-colored" like those in the photograph. (The photograph, of course, was not displayed to the jury nor was it introduced into evidence.)

■■ In *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528, the court said that testimony concerning a weapon is proper if there is proof to connect it to the defendant and the crime. (Accord, *People v. Billings* (1977), 52 Ill. App. 3d 414, 422, 367 N.E.2d 337, 344.) Here, there is some slight evidence which connects defendant and the guns reflected in the photograph with the crime, and that evidence is entirely contained in Mrs. Cuttill's description of the "dark-colored" guns used in the robbery.

Accordingly, the court properly permitted Officer Faith's testimony to come in. No error.

Fourth issue: *Were the sentences excessive?*

No.

The trial court was presented with presentence reports for all three, reflecting their prior criminal records and personal histories.

Davis: 28-year-old family man; good provider; used marijuana; prior record of a guilty plea to marijuana possession and a burglary conviction. Here, he was sentenced to 10 to 30 years.

Erbes: Single; 20 years old; convicted of illegal possession of liquor, possession of a controlled substance, and a probation violation (reckless driving and no driver's license); arrested in 1974-75 (but not prosecuted) for burglary, misdemeanor theft, possession of marijuana, and attempted murder. Here, he got 6-18.

Armstrong: Single; 20 years old; arrested in 1975-76 on a number of traffic offenses, convicted of only two; arrested in Coles County for disorderly conduct and criminal damage to property, failed to appear for trial on those charges because he was incarcerated in Moultrie County for the instant offense. He was sentenced to 4-12 years.

The defendants contend that their sentences are excessive and that the court abused its discretion in sentencing them to different terms of imprisonment for the same crime. They rely on *People v. Henne* (1973), 10 Ill. App. 3d 179, 180, 293 N.E.2d 172, 174, where the court said, "Fundamental fairness and respect for the law require that defendants similarly situated may not receive grossly disparate sentences." Yet even if this quoted dicta governed, the defendants here could hardly be said to be "similarly situated."

■■ Section 11 of article I of the 1970 Illinois Constitution provides: "All

penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. * * *." The trial court expressly considered each of the defendant's prior convictions when it imposed sentence. Since Davis had had more frequent and serious involvement with the law than had Erbes and Armstrong, he received the most severe sentence. Armstrong, who had the fewest contacts, received the lightest sentence of the three. Considering the presentencing data and the prior criminal records which were before the court below—coupled with the fact that the sentences are within the statutory range for Class I felony offenses—we are loath to "tinker" with the sentencing judge's exercise of discretion. *People v. Hines* (1976), 44 Ill. App. 3d 204, 206, 357 N.E.2d 884.

The trial court is affirmed.

Affirmed.

REARDON, P. J., and TRAPP, J., concur.